UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
STATE FARM MUTUAL AUTMOBILE
INSURANCE COMPANY and STATE FARM
FIRE AND CASAULTY COMPANY,

               Plaintiffs,

               -against-

ATLANTIC MEDICAL & DIAGNOSTIC, P.C.,
JONATHAN LANDOW, M.D., and VIVIANE
ETIENNE, M.D.,

               Defendants.
-------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
26-CV-1084 (OEM) (JAM)

ORELIA E. MERCHANT, United States District Judge:

On February 25, 2026, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company ("Plaintiffs") commenced this Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1962(c)-(d) ("RICO"), action against Atlantic Medical & Diagnostic, P.C. ("Atlantic"); Jonathan Landow, M.D.("Landow"); and Viviane Etienne, M.D. ("Etienne") (collectively, "Defendants").  *See* Complaint, Dkt. 1 ("Complaint" or "Compl."). Plaintiffs allege that Defendants have engaged in a scheme to defraud them through New York's no-fault insurance laws, N.Y. INS. LAW §§ 5101, *et seq*.; 11 N.Y.C.R.R. §§ 65, *et seq*. ("No-Fault"), and seek to recover more than $30 million in funds.  Compl. at 1.

Before the Court is Plaintiffs' fully briefed motion for a preliminary injunction seeking a stay of all pending No-Fault arbitrations and lawsuits filed against them by Defendants, and an injunction enjoining Defendants from filing any new No-Fault arbitrations or lawsuits during the pendency of this action.[1]  For the following reasons, Plaintiffs' Motion is granted.

---

[1] *See* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction and Stay at 1, Dkt. 6 ("Motion" or "Mot."); Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction, Dkt.

## BACKGROUND

### A. New York's No-Fault Statutory Framework

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act and its implementing regulations, automobile insurers are required to provide No-Fault benefits to insureds. *See* N.Y. INS. LAW §§ 5101 *et seq.*; 11 N.Y.C.R.R. §§ 65 *et seq.* The No-Fault laws provide compensation for "basic economic loss," which covers "necessary" health expenses up to $50,000 per insured. N.Y. INS. LAW § 5102(a). A covered individual may assign these benefits to medical providers in exchange for their services, and medical providers may submit claims directly to insurance companies to receive payment. *See* 11 N.Y.C.R.R. § 65-3.11(a). Insurance companies must decide whether to pay within 30 days after receiving proof of a claim or else the claim becomes overdue. *See id.* § 65-3.8(a). Denied and overdue claims may be submitted to arbitration, where the claimant must provide "a detailed listing and calculation of all incurred expenses in dispute." *Id.* § 65-4.2(b)(1)(i); *see also* N.Y. INS. LAW § 5106(b) (referring to the arbitrations as a "simplified" and "expedited" option for claim resolution). Under the No-Fault framework, "[a]ny person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act." N.Y. INS. LAW § 403(d).

Medical providers are not eligible for reimbursement of No-Fault claims if they fail to meet New York State or local licensing requirements. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12). Additionally, the No-Fault statutory framework prohibits providers from paying or receiving

___

22-6 ("Opposition" or "Opp'n"); Reply in Support of Plaintiffs' Motion for Preliminary Injunction and Stay, Dkt. 23 ("Reply").

kickbacks in exchange for patient referrals or in connection with the performance of professional services.  *See* N.Y. EDUC. LAW §§ 6530(11), (18)-(19).

### B.  The Alleged Scheme

Plaintiffs allege that Landow and Etienne operate Atlantic as a high-volume medical practice "at more than 90 multi-disciplinary clinics . . . that cater to individuals purportedly injured in automobile accidents."  Compl. ¶ 2 (referring to these clinics as "No-Fault Clinic Mills").  At these No-Fault Clinic Mills, Plaintiffs contend that Atlantic conducts examinations that "are not legitimately performed to determine the true nature and extent of patient injuries, but rather are performed as a pretext to justify unnecessary treatment and services."  *Id.*  Specifically, Plaintiffs assert that "Atlantic's patient examinations generate referrals and prescriptions for other treatment and services which can be rendered and billed by other providers operating at or through the No-Fault Clinic Mills."  *Id.* ¶ 3.  Plaintiffs further allege that

> Atlantic secures patients through improper *quid pro quo* arrangements with the No-Fault Clinic Mills where it operates.  In particular, pursuant to written or verbal 'lease' and 'service' agreements, Atlantic makes kickback payments to the No-Fault Clinic Mills in exchange for patient referrals, which are disguised as 'rent' for the purported use of space and payments for office services.

*Id.*

The services rendered by Atlantic, as alleged by Plaintiffs, result in a predetermined course of treatment for virtually every patient, "regardless of their individual needs, conditions, or diagnoses."  *Id.* ¶ 5; *see id.* ¶ 3 ("The No-Fault Clinic Mills direct Atlantic on what [] to prescribe and where to send prescriptions for medications and other goods and services ordered for patients at each location."); *id* ¶¶ 3-4 (discussing how the vast majority of patients receive trigger point injections ("TPIs") and nerve block injections ("NBIs"; together with TPIs, "Injections"); topical medications such as lidocaine 5% ointment and diclofenac 3% gel ("Topical Prescription Drugs"); durable medical equipment ("DME") and orthotics (together with DME, "Supplies"); and nerve

3

conduction studies and electromyography tests ("NCV/EMG")).    Defendants then submit reimbursement claims to Plaintiffs, which Plaintiffs contend are for "excessive and medically unnecessary tests, goods, and services that [are] not compensable under New York law." *Id.* ¶ 8. Plaintiffs allege that Defendants support this scheme by submitting bills and other supporting documents falsely representing that the services rendered "were medically necessary and reimbursable when they were not." *Id.* ¶ 9.    Culminating the scheme, "Defendants routinely initiate litigation in state court and arbitrations if [Plaintiffs] deny or reduce Defendants' claim for reimbursement." *Id.* ¶ 10.

Plaintiffs allege that, "[a]s of January 2026, Defendants have commenced more than 7,000 collection proceedings, including more than 5,200 arbitrations and over 2,100 suits in state court seeking reimbursement of No-Fault benefits from [Plaintiffs]." *Id.*  Plaintiffs assert that they have incurred damages of over $6 million paid to Atlantic for its examinations, Injections, and related medications, and over "$24 million paid to other providers for Topical Prescription Drugs, Supplies, and EMG/NCVs prescribed, ordered, or referred by Atlantic based on arrangements with or through the No-Fault Clinic Mills." *Id.* ¶ 11.

### LEGAL STANDARD

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  "The 'serious questions' standard permits a district court to grant a preliminary

injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). "Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Id.* (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)). Given that preliminary injunctions are "an extraordinary and drastic remedy," they "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 24805 (2d ed. 1995)).

## DISCUSSION

Plaintiffs argue that "[t]he relief requested here satisfies the traditional standards for a preliminary injunction in that [Plaintiffs] will suffer irreparable harm in the absence of an injunction, there are at a minimum sufficiently serious questions going to the merits as to make them fair ground for litigation, the balance of hardships tips decidedly in [Plaintiffs'] favor, and the public interest weighs in favor of granting an injunction." Mot. at 7-8. Further, Plaintiffs contend that granting the requested relief is consistent with decisions in factually similar cases in this Circuit. *Id.* at 8; *see, e.g., State Farm Mut. Auto. Ins. v. Tri- Borough N.Y. Med. Prac. P.C.*, 120 F.4th 59 (2d Cir. 2024); *Gov. Emps. Ins. v. Patel*, 166 F.4th 280 (2d Cir. 2026); *Allstate Ins., v. Landow*, 24-cv-2010 (DLI) (JRC), 2026 WL 866199 (E.D.N.Y. Mar. 30, 2026); *State Farm Mut. Auto. Ins. v. Parisien*, 352 F. Supp. 3d 215, 233-34 (E.D.N.Y. 2018). Defendants contend

5

that Plaintiffs have failed to satisfy any element of the preliminary injunction inquiry.  Opp'n at 2. The Court shall address each element in turn.

## A. Irreparable Harm

First, Plaintiffs argue that they are irreparably harmed "by having to submit to hundreds of piecemeal arbitrations and State-court cases where [they have] adequately alleged that [Defendants are] engaged in widespread fraud that is not readily apparent when considering an individual claim or date of service."  Mot. at 8.  Plaintiffs further contend that "if the arbitrations and State-court lawsuits are permitted to advance, they will proceed on an incomplete factual record" and potentially result in preclusive judgments, "which would prevent meaningful litigation of the fraud in any court, including this one."  *Id.* at 9.  Defendants assert that Plaintiffs' theory of irreparable harm fails because many of Plaintiffs' claims of fraud are barred by collateral estoppel and because *Government Employees Insurance v. Mayzenburg*, 83, 2025 WL 3259882 (N.Y. Nov. 24, 2025), vitiates Plaintiffs' declaratory judgment claim.  Opp'n at 23.

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."  *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).  To show irreparable harm, "[t]he movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999).

Plaintiffs have demonstrated irreparable harm. "Two recent Second Circuit decisions now firmly establish that in No Fault RICO cases with hundreds of pending arbitrations and state court proceedings, . . . irreparable harm is established due to the 'obscuring' of the alleged fraud and the risk of inconsistent rulings." *Landow*, 2026 WL 866199, at *4 (first citing *Tri-Borough*, 120 F.4th 59; and then citing *Patel*, 166 F.4th 280). Similarly, here, Plaintiffs have demonstrated they are likely to suffer irreparable harm by having to submit to hundreds of piecemeal arbitrations and state-court cases that could prevent meaningful litigation of their fraud claims. Mot. at 9; *see Tri-Borough*, 120 F.4th at 80-81 ("[T]o prove up allegations of a predetermined treatment protocol, a reviewing court or arbitrator must consider whether Defendants have repeatedly provided the same treatment or services to several patients regardless of their actual medical needs, which is exceedingly difficult to establish in a proceeding on a single claim."); *Patel*, 166 F.4th at 292 ("[T]he collections actions are fragmented proceedings that 'involve single claims for a single date of service, so . . . these fragmented proceedings end up obscuring what [the plaintiff] contends is an elaborate and complex fraudulent scheme.'" (quoting *Tri-Borough*, 120 F.4th at 80)). Additionally, this "risk of harm is amplified by the potential preclusive effect of the state-court proceedings and arbitrations." *Tri-Borough*, 120 F.4th at 81.

Defendants' arguments to the contrary are unavailing. First, Defendants' contention that Plaintiffs' claims are barred by collateral estoppel, Opp'n at 23, merely proves Plaintiffs' point. Indeed, "[b]oth state-court judgments and arbitral determinations can have preclusive effect in federal courts," *Patel*, 166 F.4th at 293, and, as the Second Circuit recognized in *Tri-Borough*, "it is premature at this point to attempt to ascertain the definitive preclusive effect of such proceedings because [this Court's] task at this juncture is solely to determine whether there is a sufficient showing of a risk of irreparable harm absent an injunction," 120 F.4th at 81. Second, Defendants'

reliance on *Mayzenberg* is misplaced.  That case held that "an insurer may not deny a provider's claim for reimbursement based on alleged professional misconduct that falls short of ceding control of a professional services corporation to an unlicensed party."  *Mayzenberg*, 2025 WL 3259882, at * 3.  Although Defendants are correct to note that "professional misconduct" includes improper patient referrals, Opp'n at 25, Plaintiffs have not alleged that Defendants are ineligible for reimbursement solely because they engaged in unlawful kickbacks.  Rather, as noted by Plaintiffs in their Reply, they allege that "Defendants submitted and caused to be submitted charges that were not compensable because they involved goods and services provided regardless of medical necessity and, in many cases, were improperly billed."  Reply at 8 (citing Compl. ¶¶ 39, 178, 185, 201).  Insurance fraud is therefore the core of Plaintiffs' case, not the professional misconduct discussed in *Mayzenberg*.  *See* N.Y. INS. LAW § 403(d); *Gov't Emps. Ins. v. J Flexible Corp.*, 25-cv-6700 (BMC), 2026 WL 743292, at *6 (E.D.N.Y. Mar. 17, 2026) ("This case does not concern 'referral agreements' for legitimate prescriptions (which may violate professional misconduct regulations).  Rather, it concerns 'referral agreements' for fraudulent prescriptions, which is . . . simple fraud, beyond the 'professional misconduct' bounds of *Mayzenberg*.").

Accordingly, Plaintiffs have met their burden in showing irreparable harm.

### B. Sufficiently Serious Questions Going to the Merits

Next, Plaintiffs argue that they have demonstrated sufficiently serious questions going to the merits to make them fair ground for litigation.  Mot. at 10-13.  Defendants contend that the "serious questions" standard is inapplicable in this case and that Plaintiffs nonetheless fail to raise serious questions going to merits.  Opp'n at 12-21.

"The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not

to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup*, 598 F.3d at 35; *see also Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (referring to the standard as the "fair ground for litigation standard"). This standard affords courts "flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation." *Citigroup*, 598 F.3d at 35. Accordingly, "courts applying the 'serious questions' standard have the discretion to rely on the pleadings and accompanying affidavits . . . to resolve preliminary injunction motions, provided that the movant has raised 'questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Tri-Borough*, 120 F.4th at 83 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)).

Plaintiff has established serious questions going to the merits. Similar to the 159-page complaint and 360 pages of exhibits detailing a complex scheme of patient referrals, predetermined treatment protocols, and other fraudulent mechanisms to obtain No-Fault benefits found to satisfy the standard in *Tri-Borough*, 120 F.4th at 84, Plaintiffs here have provided a 206-paragraph Complaint detailing Defendants' complex fraud scheme involving strikingly similar allegations of predetermined treatment protocols and unlawful patient referrals. *See generally* Compl. The Complaint is also supported by 23 exhibits, seven of which are verified, which include sample examination reports, summaries of medically unnecessary Injection procedures, and sample bills submitted to Plaintiffs.[2] The exhibits also include summaries of medically unnecessary treatment, prescriptions, and Supplies that Atlantic practitioners recommend to nearly every patient pursuant

---

[2] *See* Declaration of Susan McKenna ¶¶ 5-17; Dkt. 7 ("McKenna Decl."); Compl., Exhibit 2, Dkt. 1-4; Compl., Exhibit 3, Dkt. 1-5; Compl., Exhibit 4, Dkt. 1-6; Compl., Exhibit 5, Dkt. 1-7; Compl., Exhibit 6, Dkt. 1-8; Compl. Exhbit 7, Dkt. 1-9.

to the purported kickback arrangements with the No-Fault Clinic Mills.[3]    These detailed allegations, supported by documentary evidence, sufficiently raise serious questions going to merits.  *See Patel*, 166 F.4th at 296 ("[Plaintiff] sufficiently alleges a complex fraudulent scheme and provides details and documentary evidence to support its allegations. . . . On these facts we have no trouble concluding that [plaintiff] satisfied the 'flexible approach' of the serious-questions standard." (quoting *Citigroup*, 598 F.3d at 37)).

Defendants' argument for the applicability of the stricter "likelihood of success on the merits" standard is not persuasive.  Defendants contend that the "serious questions" standard is a "limited, preliminary, framework reserved for the earliest stages of litigation," and it is not applicable here due to a pre-litigation examination under oath of Landow and Atlantic's pre-litigation production of documents.  Opp'n at 13.  However, Defendants do not cite single case holding that the "serious questions" standard does not apply where there is pre-litigation discovery.  *See generally* Opp'n.  If anything, Plaintiffs' pre-litigation examination of Landow, in which he contended that the treatment and referral patterns reflect the legitimate exercise of medical care, is evidence raising serious questions going to the merits.  *See* Opp'n, Exhibit B, Dkts. 22-2 to 22-4 ("Landow EOU"); *Citigroup*, 598 F.3d at 35.

Defendants' argument that Plaintiffs have failed to raise serious questions going to the merits also fails.  Defendants contend that Plaintiffs' "pattern" theory impermissibly recasts standardized medical care as fraud, which "is both legally untenable and legally unsound."  Opp'n at 15-16.  But, again, Defendants' disagreement with Plaintiffs' theory merely reflects serious questions going to the merits.  *See Citigroup*, 598 F.3d at 35.  Defendants also contend that Plaintiffs cannot rely on an unverified complaint to satisfy their burden under the "serious

---

[3] *See* McKenna Decl. ¶¶5-13; 18-31; Compl., Exhibit 15, Dkt. 1-17; Compl., Exhibit 16, Dkt. 1-18; Compl., Exhibit 17, Dkt. 1-19; Compl. Exhibit 20, Dkt. 1-22.

questions" standard.  Opp'n at 18-19.  However, the Second Circuit in *Tri-Borough* explicitly stated that "courts applying the 'serious questions' standard have the discretion to rely on the pleadings and accompanying affidavits, particularly when no party has requested an evidentiary hearing, to resolve preliminary injunction motions."  120 F.4th at 83.  In that case, the Second Circuit upheld the district court's reliance on unsworn and unverified allegations in determining there were serious questions going to the merits.  *Id.*  The Court notes, however, that the defendants in that case waived their right to an evidentiary hearing, *id.*, and Defendants have requested one here, Opp'n at 28.  "Although there should generally be an evidentiary hearing when essential facts are in dispute," the decision to hold an evidentiary hearing is within the discretion of the Court. *Tri-Borough*, 120 F.4th at 83-84.  While Defendants dispute Plaintiffs' foundational theory of fraud, Opp'n at 15-16, the record before the Court is sufficient for it to decide, without a hearing, that there are serious going to the merits.  As Defendants themselves note, "[t]his is not a case in which the factual record is undeveloped" given Landow's examination under oath and the comprehensive document discovery.  Opp'n at 14.  The Court therefore fails to see how an evidentiary hearing would provide clarity beyond the parties' papers.  *See Tri-Borough*, 120 F.4th at 84 ("The district court here did not abuse its discretion in determining that the record before it was sufficient to allow it to decide, without a hearing and solely on the papers before it, that there was a fair ground for litigation.").

Accordingly, Plaintiffs have satisfied the "serious questions" standard.

## C.  Balance of Hardships

Plaintiffs contend that the balance of hardships tips decidedly in their favor.  Mot. at 13-14.  Defendants assert that equity weighs against granting the requested relief.  Opp'n at 26-28.

When considering a request for a preliminary injunction, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 376 (quoting *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542 (1987). "This factor is 'related' to the irreparable harm requirement as 'both . . . consider the harm to the parties' with the relevant harm being that which '(a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction.'" *Tri-Borough*, 120 F.4th at 84-85 (quoting *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010)).

The balance of hardships tips decidedly in Plaintiffs' favor. As explained above, there is a serious risk that Plaintiffs will be unable to prove the full scope of Defendants' fraud absent an injunction of both pending and future state-court lawsuits and arbitrations. *See Tri-Borough*, 120 F.4th at 80-81. Plaintiffs' sprawling fraud allegations are not susceptible to proof in the individual state-court actions and arbitrations, and they may have a preclusive effect on this federal litigation, thereby limiting Plaintiffs' opportunity for full recovery. *See id.* Moreover, any harm to Defendants "can be remedied by monetary damages should they later prevail," whereas the harm to Plaintiffs absent an injunction is irreparable. *Id.* at 85.

Defendants' counterarguments are ineffective. Defendants contend if an injunction is granted, Plaintiffs will "continue[] to collect premiums for coverage, [while] Atlantic is forced to operate without payment for an extended and indefinite period," which "threatens the viability of the practice." Opp'n at 26. While the Court acknowledges the relative financial positions of the parties, Defendants do not allege that they have no other sources of income such that an injunction would constitute irreparable harm. *See generally id*. Further, Defendants' position that "denial of injunctive relief imposes no meaningful hardship on [Plaintiffs]" does not account for the risk of

pending arbitrations or state-court actions having a preclusive effect on this Court's ability to provide relief.

Accordingly, the balance of equities tips decidedly in Plaintiffs favor.

### D. Public Interest

Next, Plaintiffs argue that injunctive relief would serve the public interest by preventing insurance fraud. Mot. at 14. Defendants do not address the public-interest factor in their Opposition. *See generally* Opp'n.

The Court must consider "the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. "Preventing fraud, especially the kind of elaborate and complex RICO scheme . . . , is plainly in the public interest." *Tri-Borough*, 120 F.4th at 85; *see also Allstate Ins. v. Mun*, 751 F.3d 94, 100 (2d Cir. 2014) (noting the "important public policy interest in the prevention of insurance fraud for the protection of consumers in New York"); *Perl v. Meher*, 960 N.E.2d 424, 426 (N.Y. 2011) ("No-fault abuse still abounds today."). As this case involves "an elaborate and complex RICO scheme," a preliminary injunction is "plainly in the public interest." *Tri-Borough*, 120 F.4th at 85.

### E. Security Bond

Lastly, Plaintiffs contend that "no bond should be required because there is no likelihood of harm to Defendants in the event the injunction was wrongly issued," as Plaintiffs "undoubtedly can pay Defendants' claims, plus any interest owed, should Defendants ultimately prevail." Mot. at 15. Defendants do not address this issue in their Opposition. *See generally* Opp'n.

Generally, a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). However, district

courts have "wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm." *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 136 (2d Cir. 1997).

Courts in this Circuit have not required insurers to post a security bond before enjoining No-Fault lawsuits and arbitrations under similar circumstances. *See, e.g., Tri-Borough*, 120 F.4th at 86; *Gov't Emps. Ins. v. Demesmin*, 23-CV-6191 (ARR) (MMH), 2024 WL 4573698, at *5 (E.D.N.Y. Oct. 23, 2024); *Gov't Emps. Ins. v. Moshe*, 20-cv-1098 (FB)(RER), 2020 WL 3503176, at *3-4 (E.D.N.Y. June 29, 2020); *Gov't Emps. Ins. v. Zilberman*, 20-cv-209-FB-RML, 2021 WL 1146086, at *2-3 (E.D.N.Y. Mar. 25, 2021); *Gov't Emps. Ins. v. Zaitsev*, 20-cv-03495-FB-SJB, 2021 WL 3173171, at *3 (E.D.N.Y. July 27, 2021); *Gov't Emps. Ins. v. Innovation Anesthesia & Pain Servs., P.C.*, 24-CV-2220 (MKB), 2025 WL 917509, at *16 (E.D.N.Y. Mar. 25, 2025). Given this case law and Defendants' silence on the issue, the Court shall not require a bond.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a preliminary injunction is granted. It is hereby ordered that: (1) all pending No-Fault collection arbitrations and state-court collection proceedings between Plaintiffs and Defendants are stayed pending resolution of this case; and (2) Defendants, including their officers, agents, servants, employees and attorneys are enjoined from initiating any new No-Fault collection arbitrations or state-court collection proceedings against Plaintiffs pending resolution of this case.

SO ORDERED.

                                        /s/
                                        ORELIA E. MERCHANT
                                        United States District Judge

April 29, 2026
Brooklyn, New York

14